IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BEATRIZ RHOADES,                              )
                                             )
            Plaintiff,                        )
                                             )
      vs.                                     )      Civil Action No. 09-0261
                                             )
YOUNG WOMEN'S CHRISTIAN                        )
ASSOCIATION OF GREATER                         )
PITTSBURGH; VALERIE WHEATLEY,                   )
as an individual; BARBARA MANNING,             )
as an individual; LILLIAN YOUNG, as an         )
individual; and DENA DAVIS, as an              )
individual,                                   )
            Defendants.                        )
                                             )

AMBROSE, District Judge

**OPINION AND ORDER**

<u>Synopsis</u>

Plaintiff, *pro se*, Beatriz Rhoades ("Rhoades") brings this action alleging a claim for

discriminatory pay under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and retaliatory

discharge, 29 U.S.C. § 215(a)(3). Defendants have moved for summary judgment dismissing the

Amended Complaint. For the reasons set forth below, I grant Defendants' motion for summary

judgment dismissing the Amended Complaint.

I. **Legal Standard**

In order to prevail on a motion for summary judgment, the moving party must

demonstrate that "there is no genuine issue of material fact and. . .the moving party is entitled to

judgment as a matter of law." <u>Jurimex Kommerz Transit G.M.B.H. v. Case Corp.</u>, 2007 WL

1

2153278, at *1 (3d Cir. July 27, 2007) (quoting Fed. R. Civ. P. 56(c)). "[W]here the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine of material fact by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Player v. Motiva Enter., LLC, 2007 WL 2020086, at *9 n.4 (3d Cir. July 13, 2007). "If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact." Id. Moreover, "[t]o defeat a motion for summary judgment, the non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.' " Jurimex Kommerz Transit G.M.B.H., 2007 WL 2153278, at *1 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

## II. Statement of Relevant Facts[1]

Rhoades was employed as an accountant by Defendant Young Women's Christian Association of Greater Pittsburgh ("YWCA") from September 26, 2005 to April 25, 2007. The YWCA is a non-profit corporation employing more than 200 persons in Western Pennsylvania. At all relevant times, defendant Valerie Wheatley ("Wheatley) was employed by the YWCA as its Chief Financial Officer. Defendant Barbara Manning ("Manning") served as the YWCA's Director of Financial Services. Defendant Lillian Young ("Young") held the position of Vice President of Human Resources. Defendant Dena Davis ("Davis") was the YWCA's Human

---

[1]Unless otherwise indicated, these facts have been agreed to by the parties or are supported by the record without evidence to the contrary.

Resources Manager. All of the individual defendants are female and were involved to varying degrees in the hiring of Rhoades and/or in her subsequent termination of employment.

**Rhoades' Employment With The YWCA**

In October 2004, the YWCA made the business decision to hire an accountant with broad accounting experience to address the immediate gaps identified by the YWCA and its external auditors. The YWCA used United Way and other not-for-profit and private pay studies and surveys to determine the pay range for the position. Ultimately, Young recommended a salary range of $30,000 to $35,000 for the accountant position. Consistent with the YWCA's mission, Davis asked the Hispanic Center of Pittsburgh for recommendations for accountant candidates. The Hispanic Center recommended Rhoades.

Rhoades applied for the accountant position on August 16, 2005. She listed a desired salary range of $28,000-31,000 on her application. At the time of her application, Rhoades was unemployed, having left her previous accountant position approximately six months earlier. Her prior compensation was $10-12 per hour. Her resume described "[o]ver 10 year (sic) in accounting activities, financial statements, financial analysis, budgeting, internal and external, auditing. Experience in public accounting." (Docket No. 56-4, at 2-13.) However, her professional experience detailed six years of accounting experience in Colombia and an additional fourteen months of experience in the United States. She held a certificate of paralegal from a community college, the equivalent of a bachelor of accounting from a university in Colombia and five years of undergraduate study of law in Colombia. Her most recent accountant post was for a small company with fewer than fifty employees and a single payroll, and Plaintiff testified that she did not have much work to do there. (Docket No. 56-2, at 23-30.)

Davis conducted Rhoades' pre-screen interview. She rated Rhoades favorably and recommended that the YWCA interview Rhoades for the accountant position. Manning and Wheatley conducted two additional interviews of Rhoades. Manning decided to hire Rhoades based on the interviews and the work experience listed on her resume. Wheatley was excited to hire Rhoades and considered her "very knowledgeable in the science of accounting as well as an independent thinker and learner." Davis called Rhoades and extended her an offer for the accounting position with a starting salary of $33,000. According to Young, it was standard practice at the YWCA to offer below the highest approved salary level in order to leave room for negotiation, if necessary, as long as the offered rate was within the considered market rate for the position. Davis sent Rhoades a confirmation letter that the YWCA had hired her for the accountant position at an annual salary of $33,000, beginning on September 26, 2005.

Rhoades received a copy of the accountant job description from the YWCA. The job summary provided that Rhoades would be "[r]esponsible for fixed assets management and documentation, general ledger account reconciliations, monthly review of indirect and direct cost allocations, preparation of monthly closing transactions, maintenance of investment schedules, general journal entry preparation and review, report preparation. Participates in payroll, and accounts payable activities." (Docket No. 56-16, at 13.) Rhoades was considered a supervisor, and was responsible for supervising Roberta Shemm, Donna Palmire and Scott Reed, and insuring the accuracy of the data that they were inputting. Rhoades reported to Manning, the Director of Financial Services.

On April 26, 2006, Rhoades received her six-month performance review from Manning. (Docket No. 68-11, at 7-11.) She received "achieves expectations" in each of the categories

4

reviewed. The evaluation also set a number of goals to be completed within a designated time frame: (1) have the payroll/accounts payable assistant trained in payroll processing by September 30, 2006; (2) have a process to perform audits of salary distribution, benefit distribution and tax distribution to ensure accuracy in place by June 30, 2006; (3) compile a list of most frequent problems as basis for a "frequently asked questions" sheet to be completed by August 31, 2006; and (4) develop a process for reconciling payroll accounts and accounts payable/general ledger on a monthly basis by July 31, 2006.

According to Rhoades, she complained to Manning in July 2006 that her predecessor, Edward Kennedy, had been paid more money than she was paid. Rhoades claims that Manning responded that she did not make the decisions about salaries. (Docket No. 68-1.) Manning testified that she did not have any memory of the conversation. (Docket No. 85-2, at 12.) Wheatley recalls that Rhoades mentioned to her that Edward Kennedy had made more money than Rhoades. Wheatley explained that Kennedy must have negotiated a higher salary. (Docket No. 68-1, at 163-65; 85-1, at 7.)

Donna Palmire resigned from the YWCA in February 2006. Scott Reed was hired in April 2006 and resigned on September 11, 2006. Their positions were filled with temporary employees. In part as a result of this instability in the assistant positions, Rhoades was unable to delegate the processing of the payroll and spent her work time doing it herself, rather than meeting the goals set forth during her six-month review. (Docket No. 56-2, at 37-40.) She was also unfamiliar with the Ceridian payroll system used by the YMCA and was still trying to learn it. (Id. at 39.) Rhoades admitted during her deposition that, after six months on the job, she did not know the Ceridian system well enough to create an audit process, only enough to process

payroll.  (Docket No. 68-1, at 108.)  On August 29, 2006, Rhoades sent an e-mail to Manning

explaining that "Scott and I we do not know how the system works in AP and GL and how they

are interacting."  (Docket No. 56-4, at 25.)

According to Defendants, Rhoades had significant attendance issues between July and

October 2006.  An attendance report notes twelve instances of leaving early or arriving late

during this period.  (Docket No. 56-4, at 21-23.)  Rhoades disputes that this record is completely

accurate. (Docket No. 56-2, at 43-46.)   Also in October, e-mails from Judy Barefoot indicate that

Rhoades was not posting invoices in the proper month.  (Id. at 26-27.)  That same month, while

Manning was on vacation, an excel spreadsheet that Rhoades was working on became corrupted.

Rhoades believed that someone intentionally sabotaged the spreadsheet.  (Docket No. 56-2, at

50.)  Manning testified that an investigation was not conducted because Rhoades told her that she

would not accuse anyone in the department of corrupting the data, and no one else had access to

the data.  (Docket No. 56-9, at12.)

On December 15, 2006, Rhoades received her annual performance evaluation from

Manning.  (Docket No. 56-4, at 43-49.)  Rhoades received an overall grade of "Needs

Improvement."  Areas of criticism included, *inter alia*:

- "Ms. Rhoades did not work closely with the Payroll/Accounts Payable Assistant to ensure that procedures and knowledge for processing the payroll is transferred";

- "Ms. Rhoades does not refer to internal and external guidelines, policies and procedures to ensure that her work is accurate";

- "Employee benefits were posted to the incorrect period twice during the 1st quarter of 2006-07";

- "Vendor invoices are frequently misplaced, entered weeks after submitted, and unable to be located when being pulled for payment";

- "Ms. Rhoades does not plan and complete payroll activities in a timely manner";

- "Ms. Rhoades has appointments which cause her to come to work late, leave early on a regular basis.  The frequent absenteeism presents an inappropriate impression to department members";

- "Ms. Rhoades needs to work closer with her team to develop deadlines and strategies for meeting deadlines."

The Performance Evaluation also set seven goals for Rhoades, many of which set new deadlines

for goals she had been given during her six-month review:

- "Ms. Rhoades should develop a timeline and strategy to audit and review payroll management reports, recommend new procedures to ensure 2006 year end accuracy by August 2006, updated to December 31, 2006."

- "Ms. Rhoades should update the Payroll Procedure Manual and document the post-payroll audit process by December 31, 2006."

- "Ms. Rhoades should have developed a process for auditing of salary distribution, benefit distribution and tax distribution, with the new process documented and in place by June 30, 2006, updated to January 31, 2007."

- "Ms. Rhoades should compile a list of most frequent problems so that a "Frequently Asked Questions" sheet can be developed for new and existing Directors and staff to minimize the errors.  This should be completed by August 31, 2006, updated to January 31, 2007."

- Ms. Rhoades should attend a Supervision training by February 28, 2007."

- Ms. Rhoades should attend a Planning and Organizing training by February 28, 2007."

On December 27, 2006, Rhoades left for vacation without providing Manning with the

information she needed to finish the payroll in Rhoades' absence.  (Docket No. 56-4, at 30-32.)

In January 2007, Rhoades did not finish the SUTA on time.  (Docket No. 56-2, at 60.)  In early

February 2007, a former employee mistakenly was sent a W-2 form belonging to a current

employee, and the former employee did not receive her W-2 at all.  (Docket No. 56-4, at 33-34.)

On February 23, 2007, Rhoades sent a memo to Manning expressing her inability to get all the work done and asking how she should prioritize her assignments. (Docket No. 56-4, at 38.)

On March 23, 2007, Rhoades was given a "Performance Improvement Plan" ("PIP") by Manning. (Docket No. 56-5, at 4-9.) The PIP identified five performance issues: attendance; judgment and decision making- payroll administration; planning and organizing- payroll and accounts receivable; supervision; and professionalism, and set forth corrective action required to address these issues. For instance, with respect to attendance, the PIP mandated that "Beatriz must be in the office in order to be successful in performing job duties and meeting critical departmental deadlines. Beatriz must not have any additional absences, be tardy or leave early for the next 60 days." (Docket No. 56-5, at 4.) The PIP also set target dates of March 30, 2007, April 5, 2007, and April 13, 2007 for the completion of various tasks, with final deadlines of April 20, 2007. Rhoades signed the PIP, but added in writing above her signature that "[t]he performance issue has information that it is not true. It is an unfair. The target date are not reasonable to meet. My workload is full already. My supervisor is continue to add more job." (Docket No. 56-5, at 9.)

On March 28, five days after she had been told in her PIP not to have any additional absences, Rhoades left a voice mail for Manning informing her that she would not be at work that day. (Docket No. 56-4, at 50.) On April 5, 2007, Manning sent Rhoades an e-mail inquiring when she could expect to receive the items past due from the PIP. (Id. at 40.) Rhoades replied: "I do not know. You know that my workload is full. I am doing my best. I will work in all the things you wanted me to work with, but it will take time to do it. How long? I do not know. Sorry." (Id. at 39.)

Several weeks later, on April 25, 2007, Rhoades received a Performance

Improvement/Counseling Form from Manning.  (Docket No. 56-5, at 12-13.)  The form stated

that:

> On April 20, 2007 during a meeting on the status of actions required for your
> performance improvement plan, you admitted that you have not met the
> requirements of the plan and based on our discussion it has become clear that you
> have not demonstrated improvement by the stated timeframes. . . .
>
> I have encouraged you to improve your overall job performance and your negative
> attitude towards constructive feedback.  When speaking to you about your work
> performance, you have been less than responsive and often argumentative.  You
> have been repeatedly counseled and are fully aware of the expectations and
> consequences of your actions."

(Id. at 13.)  The form concluded: "However, you have demonstrated that you are not willing to

address and/or correct your unacceptable work performance.  Therefore, the decision has been

made to terminate your employment effective immediately due to your continued inability to

perform in relationship to the job."  (Id.)  The decision to terminate Rhoades' employment was

made by Manning, and supported by Wheatley based on documentation provided by Manning.

(Docket No. 56-6, at 5-6.)

### Rhoades' EPA Comparators

#### Edward Kennedy

Rhoades' predecessor at the YWCA, Edward Kennedy ("Kennedy"), held the position of

"Accounts Payable Payroll Specialist."  He was hired by the YWCA in 2003 to transition their

payroll processes from paper time and record keeping to the computerized Ceridian Source 500

time and attendance module.  For this position, the YWCA had sought an individual with a

strong computer background, and a bachelor's degree or five to seven years of accounting

experience.  Because this was a new position at the YWCA, they contacted other not-for-profits, such as Goodwill, to help determine what would be an appropriate pay scale for the position, and ultimately set the pay level at approximately $34,000.

Kennedy had an Associates Degree in Accounting and was completing a Bachelor of Science in Information Science Degree with a concentration in accounting from Robert Morris University.  He had over ten years of experience working with electronic and computerized payroll procedures.  At the time that the YWCA extended a job offer to Kennedy, he was employed by DelMonte and was earning in the mid/low $30,000 range.

The YWCA offered Kennedy the A/P Payroll Specialist position at a starting salary of $33,000.  He rejected that offer, because he claimed that the YWCA's benefits package cost three times more than the benefits provided by DelMonte.  (Docket No. 56-16, at 9; 56-17, at 19.) After negotiation, Kennedy and the YWCA agreed on a starting salary of $34,000.

The job summary for the A/P Payroll Specialist emphasized the position's payroll responsibilities.

> Responsible for Association payroll, payroll tax filings, interaction with Human Resources regarding updating employee payroll records/status, report payroll information for month end journal entries, interact with Human Resources regarding employee payroll deductions and benefits, prepare entries for distribution of benefit cost to proper cost center/projects, reconciliation of payroll accounts to general ledger and other duties as assigned.  Responsible for supervision of Payroll/Accounts Payable Clerk.

(Docket No. 56-16, at 7.)  Wheatley testified that the YWCA had created the A/P Payroll Specialist position "because we were very focused on a payroll system that wasn't functioning properly, so we needed to make some adjustments and figured a specialist would be the one that would help us at that time to move forward."  (Docket No. 56-6, at 14.)  By the time Kennedy

10

left the YWCA in April 2004, the A/P Payroll Specialist position was no longer needed, according to Manning, because Kennedy had done "the job and performed at a high level and created and trained staff that reported to [him] to do the job, and it was functioning well. So it was evaluated that the same level of expertise to train staff and implement processes and procedures for payroll and accounts payable were - specifically were no longer necessary." (Docket No. 56-9, at 15.)

**Steven Meyers**

In 2007, after Rhoades was terminated, Young commissioned an outside vendor to conduct a compensation study for certain positions at the YWCA, including the accountant position. (Docket No. 56-18, at 3.) As a result, the YWCA determined that the accountant position should be a management position and raised the base salary from a range of $30-35,000 to $40,000, in order to bring it up to a market rate. (Id..) The job description for the position remained the same. (Docket No. 68-13, at 83.) However, the YWCA was looking for a candidate with more in-depth management experience, who had handled complex accounting for a large company, preferably a non-profit. (Docket No. 56-18, at 3.)

Meyers applied for the accountant position on December 15, 2007. He had more than twenty years of accounting experience, including ten years as Treasury Accountant at the William Penn Association, a $200 million non-profit insurance company. (Docket No. 68-13, at 4.) Meyers asked for a starting salary of $35-40,000. Consistent with the YWCA's policy of offering below the highest salary in their range in order to leave room for negotiations, the YWCA offered Meyers $38,000, which he accepted. (Id.)

**III. Defendants' Motion For Summary Judgment**

**A. Plaintiff's EPA Claim**

Defendants move for summary judgment dismissing the EPA claim on the grounds that Rhoades has not met her prima facie burden of demonstrating that she performed work equal to Kennedy and Meyers. Defendants also argue that, even if Rhoades did meet her prima facie burden, they have demonstrated that the pay differential was based on factors "other than sex." I agree on both counts.

**1. Plaintiff's prima facie burden under the EPA**.

In order to establish a prima facie claim under the EPA, a plaintiff must demonstrate "that employees of the opposite sex were paid differently for performing "equal work" - work of substantially equal skill, effort and responsibility, under similar working conditions." Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000). "'Skill' includes an assessment of such factors as experience, training, education and ability. 'Effort' refers to the physical or mental exertion needed to perform the job. 'Responsibility' concerns the degree of accountability required in performing a job, with emphasis on the importance of the job obligation." Genevie v. Jackson, 2008 WL 793885, at *10 (W.D. Pa. Mar. 24, 2008) (citing 29 C.F.R. § 1620). Under the statute, these three terms "constitute separate tests, each of which must be met in order for the equal pay standard to apply." Id. Additionally, "'[t]he crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different.'" Id. (quoting Brobst v. Columbus Svcs. Internat'l., 761 F.2d 148, 156 (3d Cir. 1985)).

Rhoades claims that Kennedy, who held the position of A/P Payroll Specialist, performed equal work to her for purposes of the EPA. In support of this assertion, she relies almost entirely on his job description, and the fact that he was involved in and responsible for the timely and accurate processing of payroll, as was she. However, the undisputed evidence demonstrates that Kennedy had additional responsibilities consistent with his job title of A/P Payroll Specialist that distinguished his position from hers. For instance, Kennedy had a degree in Information Science with a concentration in accounting and had held the position of "computer operator" with Del Monte. (Docket No. 56-18, at 7.) Kennedy was hired to use his background in computers and automated payroll systems to streamline the processes involved in the Ceridian Source 500 system and to implement modules, such as the Wage Garnishment and time and attendance modules. (Docket No. 56-17, at 4-5.) He trained YWCA supervisors on payroll issues, including a PowerPoint presentation to employees. (Id.) He also trained his subordinate in financial services, Donna Palmire, on payroll processes. By contrast, Rhoades was hired as an accountant and was not intended to process payroll, but rather to perform accounting and audit functions. The fact that she never achieved a sufficient understanding of the Ceridian software to accomplish this goal, or that she did not train her subordinates to process the payroll, does not change the fundamental differences between the two positions. Accordingly, Rhoades has not established a prima facie case that Kennedy performed equal work to her.[2]

Meyers, by contrast, is a closer call. He was hired into an accountant position, just as Rhoades was hired, and was intended to perform the functions that Rhoades should have

---

[2]In any event, as set forth in subpart B below, even if Rhoades had established a prima facie case with respect to Kennedy, the undisputed evidence demonstrates that their pay differential was based on factors other than sex.

performed, but with greater accountability and management responsibilities. (Docket No. 56-10, at 8.) In accordance with these increased management responsibilities, Meyers had significantly more management experience than Rhoades, including holding a Bachelor of Science degree in Business Management. (Docket No. 68-16, at 38-39.) "'[W]hen a court assesses the substantial equality between jobs, it should rely on actual job performance and content rather than job descriptions.' The court must therefore analyze the evidence of the actual job duties performed." Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp. 2d 640, 660 (W.D. Pa. 2009) (quoting Heller v. Elizabeth Forward Sch. Dist., 182 Fed. Appx. 91, 95 (3d Cir. 2006)).

The undisputed record demonstrates that Rhoades spent her employment with the YWCA mainly processing the payroll, and not performing the accounting functions she was hired to perform. By contrast, Meyers trained his subordinates in processing payroll and fulfilled his accounting responsibilities at a satisfactory level. (Docket No. 56-11, at 2-17.) See Byrnes v. Herion, Inc., 764 F. Supp. 1026, 1030 (W.D. Pa. 1991) (Plaintiff did not meet the prima facie burden of showing accounting positions were "equal," as opposed to merely comparable, where the position had evolved based on the defendant's needs and the holder's particular expertise.) Given these differences in skill and responsibility, Rhoades has not set forth a prima facie case that Meyers performed equal work to her for purposes of her EPA claim.

### 2. Defendants' Affirmative Defense

"The Equal Pay Act prohibits differential pay for men and women when performing equal work 'except where such payment is made pursuant to one of the four affirmative defenses." Stanziale, 200 F.3d at 107. The four affirmative defenses are: (1) a bona fide seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production;

and (4) a differential based on any factor other than sex." Id. at 107 n.6. Employers seeking summary judgment on an EPA claim "must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." Id. at 108. Defendants herein rely on the fourth "catch-all" factor for purposes of their motion for summary judgment.

Even if Rhoades had met her burden of demonstrating that Kennedy or Meyers performed equal work to her, Defendants have demonstrated that the pay differential between them was based on factors other than sex. With respect to Kennedy, the YWCA offered him the same salary ($33,000) that it had offered Rhoades. However, while Rhoades had only sought a salary in the $28-31,000 range, and immediately accepted the YWCA's offer of $33,000, Kennedy had sought a position in the mid-$30,000s. When offered the position at $33,000, he negotiated an additional $1,000 in salary to compensate for the higher cost of the benefits package offered by the YWCA compared to the benefits he had received at DelMonte. Where a proposed comparator negotiates a higher salary based on his prior employment, courts have determined that the salary discrepancy was based on a factor other than sex, and granted summary judgment for the employer. See, e.g., Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1462 (7th Cir. 1994) (granting summary judgment dismissing EPA claim); Underwood v. Sears, Roebuck & Co., 343 F. Supp.2d 259, 271 (D. Del. 2004) (granting summary judgment on EPA claim where comparator negotiated a higher salary based on increased responsibilities and longer commute, and where "[p]laintiff did not provide any evidence that shed doubt on defendant's justification"); McNierney v. McGraw-Hill, Inc., 919 F. Supp. 853, 860 (D. Md. 1995) (granting summary judgment on EPA claim where plaintiff and comparator were offered same salaries, but

comparator negotiated a higher salary and plaintiff did not). Here, Rhoades has failed to offer any evidence to contradict Defendants' evidence, both testimony and documentary, that the YWCA paid Kennedy a higher salary because he negotiated for one based on his prior employment.

With respect to Meyers, Defendants have offered evidence that, after Rhoades was terminated, the YWCA determined that the accountant position should be upgraded to a management level position and performed a market survey to set an appropriate salary level to hire an accountant with management experience. Based upon these factors, the YWCA determined that $40,000 was an appropriate salary for the position. Compared to Rhoades, Meyers had a significantly more stable job history, experience with a large, $200 million non-profit as Treasury accountant, and a degree in business management as well as accounting. He asked for a salary in the range of $35-40,000. The YWCA offered him $38,000, which he accepted. Again, Plaintiff has offered no evidence to contradict that the YWCA's offer to Meyers was based on anything beyond its review of the market salary level and Meyers' background. An employer may consider the marketplace value of the skills of a particular individual when determining his or her salary. Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp.2d 640, 662 (W.D. Pa. 2009); Welde v. Tetley, Inc., 864 F. Supp. 440, 457 (M.D. Pa. 1994) (plaintiff failed to produce evidence contradicting defendant's evidence that salary differential was based on its use of the HAY system to set salaries); Underwood, 343 F. Supp.2d at 271 (granting summary judgment where defendant sought a "topnotch" manager and recruited the comparator from another store).

Based on the foregoing evidence that Kennedy and Meyers were paid more than Rhoades

based on factors other than sex, "no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." Stanziale, 200 F.3d at 108. Accordingly, I grant Defendants' motion for summary judgment dismissing Plaintiff's claim under the EPA.

### B.    Plaintiff's Retaliation Claim

Plaintiff's remaining claim alleges that she was unlawfully terminated in retaliation for her complaining about the EPA violation, in violation of the 29 U.S.C. § 215(a)(3) of the Fair Labor Standards Act ("FLSA").[3]  In order to establish a prima facie case for retaliation, a plaintiff must demonstrate that: "(1) the employee engaged in protected activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between  the employee's protected activity and the employer's adverse action." Wildi, 659 F. Supp.2d at 664.  If the plaintiff sets forth a prima facie case, then the burden shifts to the defendant "to establish a legitimate, nonretaliatory reason for the adverse employment action."  Id.  "If the burden of production is met by the defendant, the ultimate burden of persuasion shifts back to the plaintiff to prove 'that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated against the plaintiff.'" Id. (citing Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989), cert. denied, 493 U.S. 1023 (1990)).

"An internal complaint is protected activity for purposes of 29 U.S.C. §215(a)(3)."  Id.

---

[3]The FLSA's anti-retaliation provision applies to EPA retaliation claims.  Wildi, 659 F. Supp.2d at 664.  "The appropriate framework for analyzing claims of unlawful retaliation under the FLSA is the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." Id. (citing Cononie v. Allegheny Gen. Hosp., 29 Fed. Appx. 94, 95 3d Cir. 2002)).

Further, termination is a materially adverse action which would dissuade a reasonable employee from engaging in the protected activity. Id. at 665. Accordingly, Plaintiff has established the first two elements of her prima facie case. In support of Defendants' motion for summary judgment, they argue that (1) Rhoades cannot establish the third prong of her prima facie case, because there is no causal connection between her alleged complaint and her termination, (2) the YWCA terminated Rhoades based on her poor performance, and (3) there is no evidence of pretext. (Docket No. 57, at 21.)

### 1. Causation

The Third Circuit has articulated two factors which are relevant to establishing a causal link for purposes of a retaliation claim: (1) temporal proximity between the protected activity and the adverse action; or (2) evidence of ongoing antagonism. Wildi, 659 F. Supp.2d at 666 (citing Abramson v. William Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001). With respect to the first factor, "[g]enerally, it can be said that if at least four months pass after the protected activity without employer reprisal, no inference of causation is created." Urey v. Grove City College, 94 F. App'x. 79, 81 (3d Cir. 2004). Here, Rhoades has submitted evidence that she complained to Manning and Wheatley in July 2006 about being paid less than Kennedy. Five months later, in December 2006, she received a negative performance evaluation from Manning. In March 2007, Rhoades was given her PIP, and in April 2007, nine months after she purportedly engaged in her protected activity, she was terminated. Even assuming that the poor performance review constituted an adverse action, all of these actions occurred more than four months after the protected activity. Accordingly, Rhoades may not rely on temporal proximity to establish the causation prong of her prima facie case.

Rhoades also attempts to demonstrate a pattern of ongoing antagonism towards her beginning after her EPA complaint. (Pl. Opp. Br., Docket No. 67, at 26.) Apart from her negative performance review in December 2006, Rhoades claims that an excel file she was working on in October 2006 was sabotaged, and that Manning refused to investigate. She further claims that her workload was increased, she was denied training, attacked with false accusations and denied recognition. The vast majority of Plaintiff's accusations are without evidentiary support apart from her own suspicions, and indeed, constitute mischaracterizations of the record. (See, e.g., Defs. Response to Pl.'s Statement of Material Facts, Docket No. 83, at ¶¶171, 173, 175.)[4] Given the lack of record evidence of ongoing antagonism beginning in July 2006, Plaintiff has not met her burden of establishing the causation prong of her prima facie case.

### 2. Defendants' Legitimate, Non-retaliatory Reasons for Adverse Action

Even if Plaintiff had established a prima facie case of retaliation, Defendants have submitted evidence that Plaintiff was terminated for performance issues. The record, as discussed in detail in Part II above, demonstrates that, during Rhoades' six-month review in March 2006, she was given a series of performance goals with deadlines. It is undisputed that, for various reasons, including Rhoades' admitted unfamiliarity with the computerized payroll system even nine months into her job, employee turnover in the payroll assistant positions, and Rhoades' absenteeism, she had not met these performance goals by the time of her one-year

---

[4]Plaintiff submits inadmissible hearsay statements from two former YWCA employees, Merle Goldberg and Kennedy, which, if true, would demonstrate that they also experienced similar treatment by Manning and had similar frustrations with their job. (Docket No. 68-13, at 17-19; 68-16, at 11-15.) Since neither Goldberg nor Kennedy made EPA complaints yet faced many of the problems that Rhoades attributes to ongoing antagonism, this evidence, if submitted in admissible form to a trier of fact, would further undermine the causation prong of Rhoades' prima facie case.

review. At her annual review, Rhoades was given new deadlines in which to meet these goals. Again, Rhoades failed to accomplish these tasks. At the same time, her absenteeism continued, mistakes were being made by both Rhoades and her support staff, and work was not being performed on a timely basis. In March 2007, Rhoades was given her PIP. While the deadlines set forth in the PIP were very short, these were tasks that Rhoades had already been given over a year to complete. When she failed to meet these final deadlines, she was terminated. Accordingly, Defendants have more than met their burden of production with respect to showing a legitimate, non-retaliatory reason for Rhoades' termination.

### 3. Pretext

Once a defendant has set forth a legitimate, non-retaliatory reason for the adverse action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008). The two prongs of the Fuentes test are distinct and must be analyzed separately. Wildi, 659 F. Supp.2d at 668.

Rhoades attempts to raise an issue of fact as to whether Defendants had a legitimate, non-retaliatory reason for her termination by listing a handful of purported misstatements or errors

they made in her performance evaluations. (Pl. Opp. Br. at 29.) For instance, Rhoades argues that she was not in fact absent on March 9, 2007, that Manning changed her story about why she did not investigate the allegedly corrupted excel file in October 2006, and that Rhoades did train one employee, Reed, in his duties. However, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765; see also, Watson v. Southeastern PA Transp. Auth., 207 F.3d 207, 222 (3d Cir. 2000) (employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct"), cert. denied, 531 U.S. 1147 (2001); Gladysiewski v. Allegheny Energy, 2009 WL 4403382, at *12 (W.D. Pa. Dec. 2, 2009) (plaintiff failed to establish pretext by "proffering his own opinion about his performance and disputing whether certain incidents occurred or the significance of them"). Thus, these purported inconsistencies, which are supported for the most part solely by Rhoades' unsubstantiated testimony, do not raise issues of fact from which a fact finder could reasonably disbelieve the YWCA's articulated reason for terminating Plaintiff.

Nor has Plaintiff submitted any evidence that discrimination was more likely than not the motivating cause of her termination. The Third Circuit has identified the nature of the evidence which may be relied upon to satisfy the second prong of the Fuentes pretext analysis: evidence demonstrating that (1) the employer previously discriminated against the plaintiff; (2) the employer has discriminated against other persons within plaintiff's protected class or other protected classes; and (3) the employer has treated similarly situated employees not within the protected class more favorably than plaintiff. See Simpson v. Kay Jewelers, 142 F.3d 639, 644-

45 (3d Cir. 1998). Here, the discrimination underlying Plaintiff's retaliation claim is her complaint of an EPA violation. See Wildi, 659 F. Supp.2d at 671. Plaintiff has not argued or adduced any evidence that she was previously discriminated against, that other employees had complained of EPA violations and been discriminated against, or that male employees who complained about unequal pay were treated differently. Thus, Plaintiff has failed to satisfy the second prong of the Fuentes pretext analysis as well.

Accordingly, I grant Defendants' motion for summary judgment dismissing Plaintiff's retaliation claim.[5]

## ORDER OF THE COURT

AND NOW, on this 27th day of July, 2010, after careful consideration, and for the reasons set forth in the accompanying Opinion, it is ORDERED that Defendants' motion for summary judgment dismissing the Amended Complaint [Docket No. 56] is GRANTED; and it is further

ORDERED that Defendants' motion to strike [Docket No. 74] is DENIED as moot.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
United States District Judge

---

[5]Because I am granting summary judgment dismissing Plaintiff's Amended Complaint, I need not address whether the individual defendants are subject to liability under its claims. For the same reason, Defendants' motion to strike Plaintiff's Statement of Facts and Opposition Brief References to Conclusions of Law (Docket No. 74) is denied as moot.